601 A.2d 131

**Melvin GRAHAM**

v.

**STATE of Maryland.**

**No. 21, Sept. Term, 1991.**

Court of Appeals of Maryland.

Feb. 12, 1992.

**400**

Victoria S. Lansburgh, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for appellant.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

Appellant Melvin Graham was charged with storehouse breaking and theft of $300.00 or more for allegedly stealing office equipment and supplies from a construction site office trailer. Following a jury trial in the Circuit Court for Baltimore City, Graham was found not guilty of storehouse breaking but guilty of theft of $300.00 or more. He was sentenced to a seven-year term of imprisonment for the theft conviction.

Before the Court of Special Appeals, Graham alleged three errors: first, that the trial court erroneously denied his motion to suppress evidence; second, that the trial court abused its discretion by failing to fully disclose to counsel the contents of a jury note; and third, that the evidence was insufficient to support the theft conviction. This Court issued a writ of certiorari on its own motion prior to consideration of the case by the Court of Special Appeals.

I.

Before trial, Graham moved to suppress items seized from him as a result of his arrest, claiming that they were the product of an illegal detention that violated his rights under the Fourth Amendment to the United States Constitution. The items seized included a box of electronic equip-

ment taken from the office trailer as well as Graham's shoes and gloves which were seized for identification purposes.

At the suppression hearing, the testimony and arguments focused on two questions: 1) did the police actually detain Graham at some time before his arrest, and 2) if so, did the police have a lawful basis for the detention at that time? To decide these issues, we review the facts of the case as presented at the suppression hearing.

Sergeant Thomas Cutler of the Baltimore City Police Department was the only witness at the suppression hearing. He testified that at approximately 8:15 a.m. on Sunday, 6 May 1990, he and his partner, Officer Rodney George, were on routine patrol in a marked police car when they noticed Graham and another man, Timothy Allen, walking east on Monument Street near its intersection with Calvert Street in Baltimore City. The officers were at a distance behind the two but noticed that Graham was carrying a cardboard box with "computer-type" equipment protruding from the top.

The officers circled the block ahead of the two men and drove west on Monument Street toward them. The officers then stopped, and approached Graham and Allen on foot. Before the officers had spoken, Allen began to walk faster and away from Graham, stating that he was not with Graham and did not know what Graham was carrying. Graham responded by denying that the box was his and saying that he was carrying it for Allen. After a brief pause, Graham then stated that they had found the box of equipment in a dumpster.

Sergeant Cutler testified that, during the course of these remarks, he and Officer George "basically were just shaking our head[s], you know, at that time. You could tell, you know, neither one of them didn't [want] to own up to it so we didn't believe them." He also stated that Graham and Allen had stopped walking and were now standing next to the officers without having been restrained or commanded

to stop in any way. Sergeant Cutler testified that Graham had put the box down when he stopped walking and that the officers noticed the words "SPC Concrete, Inc." were printed on the side of the box and on a sticker attached to a piece of the equipment in the box. The officers could see that about a half a block away there was a construction site marked with a sign reading "SPC Concrete, Inc."

Sergeant Cutler testified that several additional facts were immediately apparent to him and his partner: neither Graham nor Allen were wearing clothes like those of a construction worker; Graham's shoes and clothing were muddy despite the fact that the street was dry; and Graham was also wearing heavy work gloves though it was a warm day. Up to this time, neither Sergeant Cutler nor Officer George had asked any questions or directed the movements of Graham or Allen.

Sergeant Cutler testified that about one minute into this initial contact Officer George Fugate arrived on the scene in a marked police car. Sergeant Cutler said he then sent Officer Fugate to the construction site to investigate whether a break-in had occurred there. According to Sergeant Cutler, Officer Fugate found a security guard at the site, and together they discovered that the office trailer had been broken into. The locked door to the trailer had been pried open and items from the office appeared to be missing. The security guard told Officer Fugate that he had last checked the site at 7:15 a.m. and all had been secure.

While Officer Fugate was investigating the construction site, Sergeant Cutler and Officer George remained with Graham and Allen. The officers asked the two men for their names, addresses, and dates of birth, which Graham and Allen provided after some hesitation.

Sergeant Cutler testified that at most six minutes passed from when he and Officer George initially confronted Graham and Allen until the time when Officer Fugate reported from the construction site that a breaking and entering had recently occurred there. After receiving this information,

Sergeant Cutler ordered Graham and Allen arrested. The officers seized the box of equipment and Graham's gloves. Graham's tennis shoes were seized later that day when footprints matching the soles of Graham's shoes were found on the muddy ground near the office trailer.

At the suppression hearing, Sergeant Cutler termed the encounter a "field interview." He denied that the two were detained before they were officially arrested, stating that none of the officers had told Graham or Allen to stop at any time. According to Cutler, the officers simply approached the two and asked questions after Graham and Allen had blurted out inconsistent statements.

On appeal, Graham argues that, notwithstanding Sergeant Cutler's testimony, the officers' actions necessarily communicated to Graham and Allen that they were not free to leave. In particular, Graham points to Cutler's actions of calling for back-up[1] and sending Officer Fugate to investigate the construction site as communicating to Graham that he would be held at least until the officers learned whether a break-in had occurred at the site.

■■■ As Graham notes, this Court has held that an individual "may be restrained in a police dominated atmosphere by physical force *or a show of authority." Jones v. State,* 319 Md. 279, 287, 572 A.2d 169 (1990) (emphasis added). Graham acknowledges that a detention short of an arrest is lawful if the police have a reasonable, articulable suspicion for such action. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). He argues, however, that the facts as they were known to the police before Officer Fugate returned from the construction site did not reasonably warrant detaining him against his will.

_____

**1.** Sergeant Cutler was unsure whether he had called for a back-up officer. At trial, Officer Fugate testified he was in the immediate area when he heard Sergeant Cutler notify the dispatcher he was stopping to investigate two men, and that Officer Fugate then "responded as a back-up."

To support this position, Graham analogizes his case to the facts of *Jones*, in which this Court found that an unreasonable detention had occurred when a police officer commanded a bicyclist to stop after he saw the latter riding down a street at 3:20 a.m. while carrying clothing on hangers wrapped with plastic. The officer had known that a dry cleaning establishment was located about six blocks away and that recently there had been burglaries in the area. The officer, however, had no knowledge of any specific crimes having been committed during the early morning hours nor of any burglaries having occurred in the area that night. We concluded from these facts that "as we see it, [the officer's] stop of Jones was based on a 'hunch' that Jones may be carrying clothing from the dry cleaners located nearby. Mere hunches are insufficient to justify the stop of a citizen riding a bicycle on a public street." *Jones, supra,* 319 Md. at 288, 572 A.2d 169.

Graham argues that Sergeant Cutler similarly had no knowledge of any crime having been recently committed in the area and that the facts of which the Sergeant was aware were not sufficient under *Jones* to justify an investigative detention. Graham concludes that his subsequent arrest and the seizure of items possessed by him were improper because all evidence which resulted from the initial unlawful detention was tainted.[2]

The State responds by arguing that no detention in fact occurred before the arrests were made. The State distinguishes *Jones* by noting that the officers here never told Graham or Allen to stop but only approached the two, who spoke on their own volition and never asked to leave. The officers then merely asked a few preliminary questions over a brief period of time. The State claims there was no other show of authority, such as a police car siren, flashing lights, a drawn gun, or a frisk. Based on these facts, the State

---

2. On appeal, Graham does not contest that the police had probable cause to arrest him once they determined that a breaking and entering had occurred within the last hour at the construction site.

asserts that Graham voluntarily chose to cooperate with the police, and thus was not detained for Fourth Amendment purposes until his actual arrest.

The State further emphasizes that the Supreme Court has made clear that police questioning does not by itself constitute a detention under the Fourth Amendment:

'[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.'

*Florida v. Bostick,* 501 U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991), quoting *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983).[3] The State concludes by suggesting that even if Graham is found to have been detained before his arrest, the police had a lawful basis for that detention.

■ Our analysis begins by recognizing that under established Fourth Amendment law the police officers did not effect a seizure of Graham and Allen merely by exiting their police vehicle and approaching the two. *Bostick,*

---

**3.** The State argues that its questioning of Graham involved less of a show of authority than that at issue in *Florida v. Bostick,* 501 U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In that case, two police officers boarded a bus bound from Miami to Atlanta during a stopover in Fort Lauderdale and asked a passenger questions concerning illicit drugs. The officers were wearing badges and bright green "raid" jackets with police insignia. One carried a recognizable pistol-shaped pouch containing a handgun and stood in the aisle between the passenger and the door to the bus. The officers then gained consent to search the passenger's luggage and found cocaine. Although the Court remanded the case to the Florida courts because of a lack of express findings of fact, the Court stated: "There is no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure." *Id.* 111 S.Ct. at 2386. In the present case, the State argues that since Graham was not approached in a confined setting like that of a bus but on a public street, there was no seizure under *Bostick.*

*supra,* 111 S.Ct. at 2386; *California v. Hodari D.,* 499 U.S.
——, 111 S.Ct. 1547, 1550–52, 113 L.Ed.2d 690 (1991); *Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83
L.Ed.2d 165 (1984); *INS v. Delgado,* 466 U.S. 210, 216, 104
S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Royer, supra,* 460
U.S. at 497, 103 S.Ct. at 1323; *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877–78, 64
L.Ed.2d 497 (1980). This is not a case where the police
either physically detained a suspect, immediately commanded him to stop, or even shouted out their identity to him.
*See Jones, supra,* 319 Md. at 281, 572 A.2d 169; *Anderson
v. State,* 282 Md. 701, 706, 387 A.2d 281 (1978); *Timms v.
State,* 83 Md.App. 12, 14, 573 A.2d 397 (1990). Sergeant
Cutler gave uncontradicted testimony at the suppression
hearing that he and Officer George approached Graham and
Allen without restraining or speaking to them in any way.

■ If we assume, however, that Graham was seized
after the officers approached him, then that seizure would
have been lawful only if founded upon specific, articulable
facts which led the officers to reasonably conclude "that
criminal activity may be afoot." *Terry, supra,* 392 U.S. at
30, 88 S.Ct. at 1884. We believe that the facts as known to
the officers before any seizure conceivably occurred reasonably suggested that criminal activity was not only afoot but
was galloping ahead at a steady pace.

Before Sergeant Cutler and Officer George had said a
word, several suspicious facts became evident. First, Allen
had started to walk faster and away from Graham once he
saw the police. Second, the two men made contradictory
statements, each denying ownership or knowledge of the
box of electronic equipment Graham was carrying. Graham even contradicted himself, first saying that the box of
equipment was Allen's but then saying that they had both
found it in a dumpster. Third, the box and the equipment
were each labelled with SPC Concrete Inc.'s name, and the
officers saw that a construction site bearing the name "SPC
Concrete, Inc." was located only half a block away. Fourth,
neither Graham nor Allen appeared dressed as a construc-

tion worker, and, since it was early on a Sunday morning, it did not appear to be a workday. Fifth, Graham's clothing and tennis shoes were muddy despite the fact that the street was dry. And sixth, Graham was wearing gloves on a spring day which, as the trial judge stated, "was too warm for gloves."

██ As this Court has made clear, the level of suspicion necessary to constitute reasonable, articulable suspicion " 'is considerably less than proof of wrongdoing by a preponderance of the evidence' " and " 'obviously less demanding than that for probable cause.' " *Quince v. State*, 319 Md. 430, 433, 572 A.2d 1086 (1990), quoting *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). When evaluating the validity of a detention, we must examine "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). We find that in this case the facts taken together amount to more than the "minimal level of objective justification" required to warrant a brief detention. *Delgado, supra*, 466 U.S. at 217, 104 S.Ct. at 1763. Sergeant Cutler and Officer George were immediately confronted with an array of facts which led them to reasonably suspect that Graham and Allen were engaged in some kind of criminal activity. Thus even if the officers did in fact detain the two after making the observations we have detailed, that detention would have been lawful, and the subsequent arrest and seizure of property would not be tainted. The motion to suppress was properly denied by the trial court.

## II.

Graham next contends that the trial court abused its discretion by refusing to disclose to the parties the full contents of a note from the jury sent after two hours of deliberation. The note stated that the jury could not reach a unanimous verdict and indicated the jury's numerical split. The court disclosed to counsel all but the numerical split, stating that the jury had indicated its vote but that it would

be improper for the court to reveal it. The court then asked the parties what action they would propose, finally settling on giving the jury a modified *Allen* instruction[4] before requiring further deliberation.

Graham argues that the court, by not revealing the numerical split, improperly put him in a position of not knowing what option to recommend to the court. The State argues alternatively that 1) this issue should not be reviewed on appeal because defense counsel did not properly preserve it at trial, and 2) the trial judge properly refused to disclose the numerical split.

---

**4.** An *Allen* charge takes its name from *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). We have disapproved the giving of an original *Allen* charge, and have instead approved an instruction that closely follows the language of Standard 15–4.4 (formerly Standard 5.4) of the *Standards for Criminal Justice* (1978, 1986 Supp.), provided there is no deviation in substance from the language of that standard. *Goodmuth v. State,* 302 Md. 613, 622–23, 490 A.2d 682 (1985); *Burnette v. State,* 280 Md. 88, 96, 371 A.2d 663 (1977); *Kelly v. State,* 270 Md. 139, 144, 310 A.2d 538 (1973). Standard 15–4.4 provides:

 (a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:
 (i) that in order to return a verdict, each juror must agree thereto:
 (ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
 (iii) that each juror must decide the case for himself or herself but only after an impartial consideration of the evidence with the other jurors;
 (iv) that in the course of deliberations, a juror should not hesitate to reexamine his or her own views and change an opinion if the juror is convinced it is erroneous; and
 (v) that no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.
 (b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in paragraph (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.
 (c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement.

Maryland Criminal Pattern Jury Instruction 2:01 follows the language of this Standard.

We first review the discussion between the court and the parties concerning the jury note:

THE COURT: Counsel, I have received a communication from the jury which indicates that they are split in that they cannot, I am not saying how, that they cannot reach a decision, and I thought I should share that with you.

What do you want me to do? It is three twenty-five. The jury has been deliberating for quite awhile. Although they should not have, they indicated their vote. I will not share that with you, of course.

THE STATE: Your Honor, the State would request if possible that they just try to continue negotiating at least for an hour or so.

THE COURT: What about a modified *Allen* charge? You want me to do that or not?

THE STATE: I am sorry, I couldn't hear what you said.

THE COURT: You want me to give a modified *Allen* charge or not?

DEFENSE COUNSEL: If I may, your Honor?

THE STATE: Yes, the State would request that.

THE COURT: Mr. Stabile [defense counsel].

DEFENSE COUNSEL: Well, Judge, they have been out almost two hours. Mr. Graham's desire is to accept a hung jury at this point.

THE COURT: Is to do what?

DEFENSE COUNSEL: Accept a hung jury at this point.

THE COURT: Well, I am not going to hang the jury. That is not one of the options. I am not about to excuse the jury. I think it is probably a good idea, considering the short nature of the trial, it took only a few hours to try and considering the fact that they have been out since one-thirty which means they have been out two hours, I would suggest a modified *Allen* charge to see where we are. By the end of the day we can make a decision as to whether we bring them back or not. Is that fine?

DEFENSE COUNSEL: That is fine.

Ordinarily we will not decide an issue unless it plainly appears by the record to have been raised in or decided by the trial court. Maryland Rule 8–131(a). Unless Graham had no opportunity to do so, he is required to have made known to the court his objection to the ruling at the time the ruling was made. Maryland Rule 4–323(c). The record in this case reflects that defense counsel had an adequate opportunity to request that the trial judge disclose the entire contents of the note and to object to the failure of the trial judge to do so. Instead, with full knowledge that the information disclosing the numerical split of the jury was contained in the note and that the trial judge did not intend to disclose it, defense counsel interposed no objection and acquiesced in the giving of the modified *Allen* charge. The failure to object under these circumstances amounts to a waiver of the objection. *Kennedy v. Crouch*, 191 Md. 580, 586, 62 A.2d 582 (1948); *Davis v. State*, 189 Md. 269, 273, 55 A.2d 702 (1947); *Leuschner v. State*, 41 Md.App. 423, 436, 397 A.2d 622, *cert. denied*, 444 U.S. 933, 100 S.Ct. 279, 62 L.Ed.2d 192 (1979), *reh'g denied*, 444 U.S. 1027, 100 S.Ct. 693, 62 L.Ed.2d 662 (1980). The issue is therefore not preserved for appeal.

Moreover, under the facts of this case, the actions of the trial judge would not have constituted reversible error even if the defendant had interposed a timely objection. Assuming for the purpose of discussion that the trial judge should have disclosed the full contents of the note to counsel and to the defendant, the information concerning the numerical split of the jury would have been of potential assistance to the defendant only in connection with the two options then available—the grant of a mistrial or further instructions to the jury. With respect to the former, if the note had disclosed a split favorable to the defendant, he may not have asked for a mistrial. That point is academic, however, because the court declined to grant a mistrial. Had the note disclosed a split favoring conviction, the defendant may have been inclined to seek a mistrial, but that point is

also academic because that is the position the defendant did take, and the court did not err in denying the motion.

■ With respect to the option of giving further instructions to the jury, the defendant argues that he may have been inclined to object to the giving of further instructions if the note had disclosed a numerical split favoring conviction. That argument proceeds from a weak premise. The giving of a modified *Allen* charge in the form approved in this State may well be less coercive to a minority of jurors than the seemingly blunt command to "continue deliberating" given by a judge whom the jurors know is aware of their numerical division. We have approved the ABA version of this instruction because it is fair and neutral in its approach; it performs the necessary function of telling the jurors to continue their deliberation and at the same time avoids overt or subtle coercion. Indeed, the instruction is favored by some defense attorneys who believe it provides necessary resolve to jurors who are in the minority, and who might otherwise be intimidated by their position.[5]

Assuming, however, that the defendant might have been motivated to argue against the giving of the modified *Allen* charge if he had known the contents of the note, and if the note had disclosed a split favoring conviction, it would not have been error for the court to give the instruction in the face of that argument. In *Mayfield v. State*, 302 Md. 624, 490 A.2d 687 (1985), we held it was not error for a trial judge to give a modified *Allen* charge after the jury had voluntarily revealed its numerical division, which stood at eleven to one for conviction on four counts, and nine to three for conviction on the remaining count. We said there:

---

5. The report of the Chicago Jury Project, referring to a series of experiments by the Psychologist Asch and others, noted that "in an ambiguous situation a member of a group will doubt and finally disbelieve his own correct observation if all other members of the group claim that he must have been mistaken." See the discussion following Standard 15–4.4, *Standards for Criminal Justice* (1978, 1986 Supp.).

We believe that it would be sheer speculation to conclude that, when a jury becomes deadlocked and voluntarily reveals its numerical split, it is always coercive for the trial judge to give an ABA recommended *Allen*-type instruction. This is particularly true in light of the charge's repeated stress upon the need for each juror's individual judgment and the obligation of each juror to adhere to his own convictions. As our cases make clear, whether to have the jury continue deliberating, with or without an ABA approved *Allen*-type charge, or whether to declare a mistrial, is a matter for the trial judge's discretion.

*Id.* 302 Md. at 632, 490 A.2d 687.

Under the circumstances of this case, the court did not abuse its discretion by refusing to declare a mistrial. The jury had been deliberating for less than two hours, and it was still mid-afternoon. Any error, then, by the trial court in not revealing the numerical split to counsel would have been harmless in light of the action ultimately taken by the court.

Before proceeding to the final question, we offer this commentary concerning communications which disclose the jury's numerical division. As the United States Supreme Court pointed out in *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926), a judge should not ask a jury to disclose its numerical division.[6] Our review of the cases in this area reveals, however, that juries

---

**6.** In *Brasfield*, it was held reversible error for the trial judge to inquire into the numerical division of a deadlocked jury. *Brasfield* is generally interpreted as being directly applicable only to the federal courts. *See Ellis v. Reed*, 596 F.2d 1195, 1198 (4th Cir.1979); *U.S. ex rel. Kirk v. Director, Dept. of Correct.*, 678 F.2d 723, 727 (7th Cir.1982); *Cornell v. State of Iowa*, 628 F.2d 1044, 1047 (8th Cir.1980). State courts have generally agreed that the trial judge should not inquire of the jury concerning its numerical division, and have divided on the question of whether that error requires reversal in every instance or whether reversal depends upon the totality of circumstances and the level of coercion inherent in such a request under those circumstances. See the cases collected at Annot., 77 A.L.R.3d 769, 784–803 (1977, 1991 Supp.).

often volunteer this information. Some judges, aware of that propensity, include in the instructions given at the conclusion of the case an admonition that the jury is not to disclose such information. *See Smith v. U.S.*, 542 A.2d 823, 824 (D.C.App.1988) ("Trial judges properly instruct juries never to reveal their numerical division when communicating with the court during deliberations." Inclusion of such an instruction should be "a fixed practice" with every trial judge.). But, whether the cautionary instruction is given or not, the problem of what to do when the jury volunteers the information remains.

Maryland Rule 4–326(c) provides:

(c) **Communications With Jury.**—The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action.

There are times, as the Court of Special Appeals noted in *Allen v. State*, 77 Md.App. 537, 546, 551 A.2d 156 (1989), when failure to fully disclose the contents of a jury communication will constitute reversible error. In *Allen*, the judge received a note from the jury stating that the jurors were eleven to one for conviction, and the lone juror was adamant in his stance. The trial judge informed the parties that the jury was deadlocked, but did not disclose the exact number of the vote or in whose favor it stood. Thereafter, at the suggestion of the trial judge, the defendant agreed to accept a majority verdict. Reversing the conviction, the Court of Special Appeals said:

We hold that Rule 4–326(c) requires full communication of the contents of a jury communication so that both parties can have input into the response. In *Smith v. State*, 66 Md.App. 603, 624, 505 A.2d 564, *cert. denied*, 306 Md. 371, 509 A.2d 134 (1986), we stated that "[w]hile the rule expressly requires notice to the parties of any communication from the jury, its very spirit is to provide

an opportunity for input in designing an appropriate response to each question in order to assure fairness and avoid error."

*Id.* 77 Md.App. at 545, 551 A.2d 156.

█ We agree that the spirit of the Rule is to provide relevant information to those most vitally concerned with the trial and that the facts of *Allen* compelled reversal. We note, however, that there may be occasions when at least a part of a communication from a jury may properly be withheld from the parties and/or from the public record. *See United States v. Ronder,* 639 F.2d 931, 934 (2d Cir. 1981) ("On occasion the personal nature of a note or the risk of exacerbating tensions among jurors may make it appropriate to forgo reading the text of the note to the entire jury; in that event it may be appropriate to disclose the note to counsel *in camera* or even to make some redaction."); *United States v. Robinson,* 560 F.2d 507, 516–17 (2d Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (note from jury that provided no new information except name of holdout juror properly withheld from counsel and sealed in the record). Moreover, the Rule relates to communications "pertaining to the action," and we do not suggest that the failure to disclose the contents of a note from a juror requesting transmittal of a purely personal message to a member of the jurors' family or to a babysitter would constitute error.

█ The communication in the case before us falls within the letter and the spirit of Rule 4–326(c), and although it is unfortunate that the jury volunteered unwanted information, there does not appear to be any sound reason for having withheld that information from the parties. As we have noted, however, the issue was not preserved, and if it had been preserved, the error nevertheless was harmless.

### III.

█ Graham's final issue on appeal is his claim that the evidence was insufficient to support his conviction for theft

of property worth $300 or more.[7] Graham does not contest that the jury could reasonably have found that he stole a personal computer, its accompanying keyboard, and a facsimile machine. He argues, however, that the State failed to establish that these items were worth $300 or more. As a result, he contends, he may be convicted only of the offense of theft under $300.[8]

Under Maryland's consolidated theft statute, Article 27, Sections 340–344, the State must prove value of $300 or more as an element of felony theft. *Hagans v. State*, 316 Md. 429, 443, 559 A.2d 792 (1989). As an element of the offense, value must be proved as a matter of sufficiency of evidence:

> Maryland case law generally supports the notion that where a criminal statute separates the offense by a value determination, it is necessary for the State to prove value in terms of the sufficiency of the evidence.

*Spratt v. State*, 315 Md. 680, 686, 556 A.2d 667 (1989).

 The question of the sufficiency of the evidence to prove value has not been preserved for our review. Maryland Rule 4–324(a) provides in pertinent part:

> A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at

---

**7.** The consolidated theft statute, Article 27, Sections 340–344, provides that the offense of theft shall be a felony or a misdemeanor depending upon the value of the property stolen. Section 342(f) makes $300 the dividing line:
> (1) A person convicted of theft where the property or services that was the subject of the theft has a value of $300 or greater is guilty of a felony....
> (2) A person convicted of theft where the property or services that was the subject of the theft has a value of less than $300 is guilty of a misdemeanor....

**8.** This Court has held that theft under $300 is a lesser included offense of theft of $300 or more, and a defendant may be convicted of the lesser instead of the greater offense even though only the greater was originally charged. *Hagans v. State*, 316 Md. 429, 450, 455, 559 A.2d 792 (1989).

the close of all the evidence. *The defendant shall state with particularity all reasons why the motion should be granted.* (Emphasis added.)

Although Graham moved for a judgment of acquittal at the conclusion of all the evidence, he did not state as a ground for his motion the alleged insufficiency of the evidence to prove that the goods stolen had a value of $300 or more.

THE COURT: Is there any argument you want to make on [the motion]?

DEFENSE COUNSEL: No specific argument. I don't think the State has proven that SPC Concrete, Inc. is licensed as a corporation, licensed to practice in the State of Maryland.

THE COURT: That is not, as I understand, an element of either count one [storehouse breaking] or count six [theft of $300 or more].... So I am going to deny the motion.

A claim of insufficiency of the evidence is ordinarily not preserved if the claim is not made as a part of the motion for judgment of acquittal. *Muir v. State,* 308 Md. 208, 218–219, 517 A.2d 1105 (1986); *State v. Lyles,* 308 Md. 129, 135–136, 517 A.2d 761 (1986).

In an effort to avoid the obvious preservation problem, the defendant suggests his sentence for theft was illegal and argues that an illegal sentence may be challenged at any time. *See* Maryland Rule 4–345(a). The short answer to this contention is that the sentence was not illegal. Graham was convicted of the crime of theft of goods having a value of $300 or more, and his sentence of seven years imprisonment was within statutory limits for that offense.

Accordingly, for the reasons stated, we affirm the judgment below.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED, WITH COSTS.