964 A.2d 244

**Mohammed Ansu KAMARA**

v.

**STATE of Maryland.**

**No. 2943, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Feb. 3, 2009.

60

Anne K. Olesen, Washington, DC, for appellant.

Edward J. Kelley (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: DAVIS, JAMES A. KENNEY, III (Retired, Specially Assigned),* ADKINS, JJ.

JAMES A. KENNEY, III, J., (Retired, Specially Assigned).

A jury sitting in the Circuit Court for Prince George's County convicted appellant, Mohammed Ansu Kamara, of solicitation to commit murder. Following a disposition hearing, he was sentenced to ten years' imprisonment, with all but seven years suspended, and five years' probation. This appeal presents three questions for our review, which we have consolidated and reworded as follows: [1]

---

* Sally D. Adkins, now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

1. Appellant states the issues as follows:

I. Was the evidence sufficient to sustain appellant's conviction for solicitation to commit murder?

II. Did the circuit court err in imposing appellant's sentence?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

At the trial, Margaret Kanu ("Kanu") testified that she met appellant in November 2000, and that they became romantically involved in April 2001. According to Kanu, their relationship, from the beginning, was one of "violence, fighting all the time, lying, [and] cheating." When she ended the relationship on December 13, 2005, appellant began showing up uninvited at her home and workplace. When she would return home from work late at night, appellant would be waiting in the parking lot. On one occasion, he poured sugar into the gas tank of her car. Despite her requests that he leave her alone, appellant continued to contact her, which made her nervous and scared.

Maurice Proctor ("Proctor") testified that he and appellant had worked together at Lamar and Wallace Mill Work ("L & W") "between 2004 and 2005." In their conversations, appellant expressed his "frustrations" because Kanu would not talk to him or return his calls. Sometime before Proctor left L & W in November 2005, appellant asked him to "beat [Kanu] up." Appellant also "mentioned [that] he wanted [Proctor] to

---

I. Whether there was insufficient evidence to convict [appellant] for solicitation to commit murder when the State failed to establish that [he] tried to persuade Proctor, the State's informant, to kill Ms. Kanu.

II. Whether there was insufficient evidence to convict [appellant] for solicitation because no reasonable jury could find, beyond a reasonable doubt, that [he] was not induced by the State, or that he was predisposed prior to being induced by the State, to commit solicitation to commit murder.

III. Whether the Court impermissibly relied on its unsubstantiated characterization of [appellant's] behavior as falling within a pattern of domestic violence when imposing a sentence.

kill her[.]" According to Proctor, the conversations related to killing Kanu were initiated by appellant, and he did not attempt to persuade appellant to kill Kanu.

Proctor testified that after leaving L & W, he and appellant maintained contact. When appellant again asked him to kill Kanu, he responded that "if [appellant] gave [him] some money, [he would] probably take care of it for him" because "[he] was in need for some money at the time." Proctor testified that he did not intend to kill Kanu and that his "main objective was to get [appellant's] money." According to Proctor, appellant "said [that] he was going to give [Proctor] five hundred dollars before he left [for Africa] and give [Proctor] fifteen [hundred dollars] when he got back." At first, Proctor did not believe appellant seriously desired to have Kanu killed, but later he did.

Proctor was arrested on March 23, 2006, for an unrelated drug charge.[2] In an effort to "get off on the drug charge," he informed the police about his conversations with appellant. This led to telephone and personal conversations between Proctor and appellant that were monitored by the police. During these conversations, appellant instructed Proctor to kill Kanu "around where she worked at" before he left for Africa.

Detective Bernard Nelson testified that, on March 23, 2006, he was contacted by Proctor, who "indicate[d] that someone was trying to hire him to kill his girlfriend." He met with Proctor, and, later that night, "[he] asked [Proctor] if he [could] place a phone call . . . to [appellant], just to verify . . . that [appellant] actually did want to have his girlfriend killed." The phone call was recorded. Four additional phone calls were recorded, one on April 4, 2006, and three on April 8, 2006. Proctor and appellant met twice, on April 6 and April 8, 2006. The meetings were recorded and videotaped. Detective Nelson had Proctor notify the police when appellant

---

**2.** During trial, it was stipulated that Proctor, in 1995, had been convicted of two separate robberies and uttering a false document. In 1998, he had been convicted of distribution of cocaine.

wanted to meet with him. On April 6, 2006, Proctor informed the police that he would be meeting with appellant that same day.

During the April 6, 2006 meeting, Proctor and appellant drove to Kanu's workplace. As they drove, the two discussed appellant's relationship with Kanu, as well as the plan to kill her. When they arrived at Kanu's workplace, appellant identified her vehicle. Appellant wrote down the vehicle's license plate number on a piece of paper and gave it to Proctor, who gave it to the police. Appellant stated to Proctor, "From this point now it's up to you." When appellant stepped out of the car for a moment, Detective Nelson called Proctor and asked him to inquire specifically as to how appellant wanted Kanu killed. Appellant instructed Proctor to shoot Kanu at her workplace, stating, "Just shoot her and keep going.... Just pull to the side, boom, boom, boom, boom, boom, boom, and keep going." He stated, "Yeah, put a bullet in her ass. Don't stab her, it's nighttime, understand. She ain't gonna stop. She ain't stupid. She's smart."

At the request of the police, Proctor initiated the April 8, 2006 meeting. During this meeting, appellant reiterated his intent to have Proctor kill Kanu, but asked him to wait several months because it was then too "hot" and too many people were aware of his problems with Kanu, which would make him the primary suspect even if he was in Africa. Appellant told Proctor to delay the murder until December 2006, while he was away in England. He gave Proctor $100, in the form of five $20 bills, and promised to "give [him] some more[.]" Proctor gave the money to Detective Nelson after the meeting.

During the trial, Detective Nelson explained the purpose of the meetings:

> We were hoping that [Proctor] would get [appellant] to talk about the money and also how he wanted his girlfriend killed. And we were only able to get him to accomplish one part of that, and that was about how he wanted his girlfriend killed. It was him that went ahead and continue

about the money after he gave [ ] Proctor the hundred dollars, how he was going to pay him later.

On April 11, 2006, Detective Nelson went to appellant's workplace and asked to speak with him. Appellant agreed to speak with him, and they went to Detective Nelson's office. Prior to the interview, appellant was advised of his rights.

At the beginning of the interview, Detective Nelson told appellant that Proctor had been arrested for killing Kanu. He explained that he employed this "shock technique" to "try to elicit him to tell ... the truth, that he did ask [Proctor] to murder [Kanu]." Appellant initially denied knowing Proctor, but later he admitted that he "used to work with [ ] Proctor and he used to tell [ ] Proctor about his problems with [Kanu]." Detective Nelson testified that, eventually, appellant "admitted that he did express that he wanted [ ] Proctor to kill [Kanu], but he told ... him not to at the end[.]" When Detective Nelson asked appellant about the $100 he gave to Proctor, appellant responded that it was for Proctor "to buy some gas." Appellant made a written statement, which was admitted into evidence.

Ansu Kamara ("Ansu"), appellant's father, testified that Kanu was appellant's girlfriend. Ansu stated that appellant and Kanu dated for approximately six years, and that Kanu had lived with him and appellant for approximately six months. Ansu stated that he never observed any violence between them.

Billy Williams ("Williams") testified that he worked with appellant at L & W and had observed appellant and Kanu together approximately six to eight times. He did not believe that appellant was a violent person.

William Lamar ("Lamar") testified that he had worked with appellant at L & W for approximately eight years and that Proctor had also worked there for approximately eighteen months. Lamar described appellant as a model employee who never demonstrated any violence.

Samuel Crouch, another L & W employee, testified that he worked with appellant and appellant did not exhibit violent tendencies.

Appellant testified that he started dating Kanu in 2001, and that they did not argue often during their relationship. He confirmed that he and Proctor discussed his relationship with Kanu. Appellant testified that Proctor left L & W in November 2005, and that he had no contact with him until Proctor called him in March 2006. He did not initiate any calls, conversations, or meetings in reference to having Proctor kill Kanu, and he only showed Proctor where Kanu worked because Proctor asked him to do so. When asked why he gave Proctor $100, appellant stated, "I gave him the hundred dollars for me wasting his time for his troubles being that he had been talking to me and he asked me that he was broke [and] needed money." He did not intend on giving Proctor additional money when he returned from Africa. Appellant blamed his angry behavior on his drinking problem.

At the close of the State's case, counsel for appellant made a motion for judgment of acquittal, stating:

Number two, I think there was entrapment by the police in dealing with this matter.

\* \* \*

I think there was entrapment by the police in reference to having [appellant] allege to make certain statements. They used an individual who has—who was arrested and was not charged, but promised leniency to deal with attempting to get a solicitation charge on [appellant]. I think the State has not shown that there was—the State has not shown enough evidence to convict [appellant] of solicitation when it was initiated by the police and by the individual who was arrested. I don't think that there's enough evidence so that he can be found guilty by this jury of solicitation for murder. I don't think that the State has proven that there was solicitation in this particular case.

The motion was denied. After the close of all of the evidence, appellant's counsel again moved for judgment of acquittal, asserting:

I would renew my [M]otion for Judgment of Acquittal. Again, I suggest to the Court that there was entrapment by the State in processing this matter. . . .

I suggest, Your Honor, that the State has not made out a case beyond a reasonable doubt, and inasmuch as we're looking at—we're in a different posture now, it's not, the Court has to look at facts most favorable to the State, it's now a matter of beyond a reasonable doubt, and I don't think that they have met their burden to deal with finding [appellant] guilty beyond a reasonable doubt. And based on that, Your Honor, I would ask the Court to issue a Judgment of Acquittal.

The circuit court denied the motion and, after a short recess, the jury instructions were given, including the following instruction:

You have heard evidence that [appellant] was entrapped. When a person is not predisposed to commit the crime, prior to the time that the law enforcement officers make initial contact, and is induced or persuaded by law enforcement officers or someone acting for the officers to commit the crime, that person is entrapped and is not guilty of the crime. The State has the burden of proving, beyond a reasonable doubt, either that there was no inducement or that [appellant's] conduct was due to a predisposition to commit the crime.

Even if the law enforcement officers provided a favorable opportunity to commit the crime, there is no entrapment prior to the time that a law enforcement officers makes initial contact. Likewise, there is no entrapment if the law enforcement officer merely provide[s] a favorable opportunity to commit this crime to a person who was already predisposed to do the act prior to the initial contact. Predisposition or willingness to commit a crime may be shown by evidence, direct or circumstantial, that [appellant] was

ready and willing to commit the crime charged prior to the time that the law enforcement officer made initial contact. In determining whether [appellant] was predisposed to commit the crime, you should consider that evidence, along with all of the evidence, in the case.

Neither the State nor the defense objected to the instructions.

The jury convicted appellant of solicitation to commit murder. Appellant was sentenced on January 26, 2007. At the conclusion of the sentencing hearing, the court advised appellant that he had "30 days to note [his] appeal, 90 days to ask for a reconsideration, [and] 30 days to ask for a Three–Judge [En] Banc Panel who [could] either raise or lower [appellant's] sentence as they deem[ed] appropriate." When the court asked the defense counsel if there were any other issues, counsel responded, "No, Your Honor."

Appellant appealed on February 6, 2007.[3]

### DISCUSSION

#### I. Solicitation to Commit Murder

Appellant asserts that there was insufficient evidence to convict him of solicitation to commit murder because "the State failed, as a matter of law, to prove that [he] solicited Proctor [to kill Kanu] beyond a reasonable doubt[,]" and the State failed to prove that he was not "entrapped as a matter of law."

The State contends that "the arguments asserted on appeal are unpreserved because the record confirms that they were not presented by [appellant] in his motion for judgment of acquittal at the close of evidence." Appellant argues that, "[t]aken together, as they must be, these detailed motions for acquittal are sufficient to preserve the issues for appellate review."

---

**3.** On December 19, 2006, appellant moved for a new trial. The record does not reflect that the motion has been ruled on, but on May 1, 2008, just prior to oral argument, appellant withdrew the motion.

## A. Consideration of Both Motions
## for Judgment of Acquittal

■ When appellant offered evidence in his own defense, he withdrew his first motion for judgment of acquittal by operation of law. *See* Maryland Code Annotated (2001), § 6-104(a)(3) of the Criminal Procedure Article ("CP") ("If the defendant offers evidence after making a motion for judgment of acquittal, the motion is deemed withdrawn."); Maryland Rule 4-324(c) ("A defendant who moves for judgment of acquittal at the close of evidence offered by the State may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. In so doing, the defendant withdraws the motion.")

In *Warfield v. State,* 315 Md. 474, 487, 554 A.2d 1238 (1989), the Court of Appeals stated:

We are not of a mind ... that the second motion for judgment of acquittal must stand alone.... The general purpose of the statute and the rule is patent. It is to implement, by means of a motion for judgment of acquittal, the constitutional authority given an appellate court to pass on the sufficiency of the evidence. The specific purpose of the mandate of the rule to particularize the reasons for the motion is to enable the trial judge to be aware of the precise basis for the defendant's belief that the evidence is insufficient. Then the judge in determining the motion may fully appreciate the position of the defendant. All in all the command to particularize the reasons operates to the benefit of the defendant and also acts as an aid to the trial judge.

When a defendant offers evidence on his own behalf after his motion for acquittal is denied, the motion is withdrawn and not subject to review. *But the reasons given for the motion are still within the ambit of the trial; they are not erased.* To strike them from the record so as to preclude their consideration with respect to the second motion is against sound reason, common sense, and the legislative

intent. We do not see the "great burden" ... this view would impose on the trial judge.

*When a party makes anew a motion for judgment at the conclusion of all the evidence and states that the motion is based upon the same reasons given at the time the original motion was made, or when a party "renews" a motion for judgment and thereby implicitly incorporates by reference the reasons previously given, the reasons supporting the motion are before the trial judge.* If, for any reason, the judge desires that the reasons be restated, the judge may simply say so, and the moving party must then state the reasons with particularity. If the judge does not wish the reasons restated, he or she may proceed to decide the motion on the grounds previously advanced. Obviously, when the moving party wishes to advance new or different reasons at the time the second motion is made, that party may do so, but should be careful to state whether the reasons being advanced are in lieu of or in addition to the reasons previously given.

We caution, however, that it would be far better for the defendant to place on the record that his reasons are the same as previously stated, and set out such further reasons he may have, but we do not think the intent of the rule is that he must be denied a review of the evidence for failure to do so.

(Citations omitted; emphasis added.)

Therefore, where, as here, the subsequent motion for judgment of acquittal renews the first motion, the arguments made in both motions may be considered. *See Laubach v. Franklin Square Hospital,* 79 Md.App. 203, 208 n. 3, 556 A.2d 682 (1989)("[T]he Court of Appeals has made clear that the particularity requirement of [Maryland Rule 4–324(a) ] is satisfied if, at the end of all the evidence, the party "states that the motion is based upon the same reasons given at the time the original motion was made, or ... 'renews' a motion for judgment ... thereby implicitly incorporat[ing] by reference the reasons previously given.").

### B. Particularity Requirement

 Rule 4–324(a) provides that, in a motion for judgment of acquittal, "[a] defendant shall state with particularity all reasons why the motion should be granted." "When ruling on a motion for judgment of acquittal, the trial court is not required to imagine all reasonable offshoots of the argument actually presented." *Starr v. State*, 405 Md. 293, 304, 951 A.2d 87 (2008). Moreover, a defendant "is not entitled to appellate review of reasons stated for the first time on appeal[,]" *id.* at 302–303, 951 A.2d 87, and "[a] defendant may not argue in the trial court that the evidence was insufficient for one reason, then urge a different reason for the insufficiency on appeal in challenging the denial of a motion for judgment of acquittal." *Bates v. State*, 127 Md.App. 678, 691, 736 A.2d 407 (1999), *overruled on other grounds by Tate v. State*, 176 Md.App. 365, 933 A.2d 447 (2007). In *Fraidin v. State*, 85 Md.App. 231, 244–245, 583 A.2d 1065 (1991), *cert. denied*, 322 Md. 614, 589 A.2d 57, this Court explained:

> In a jury trial, the only way to raise and to preserve for appellate review the issue of the legal sufficiency of the evidence is to move for a judgment of acquittal on that ground. *Under Md. Rule 4–324(a), a defendant is further required to argue precisely the ways in which the evidence should be found wanting and the particular elements of the crime as to which the evidence is deficient. . . .* "Moving for judgment of acquittal on the grounds of insufficiency of the evidence, without argument, does not preserve the issue for appellate review."

(Citations omitted; emphasis added.)(Quoting *Parker v. State*, 72 Md.App. 610, 615, 531 A.2d 1313 (1987).)

### C. Solicitation to Commit Murder

 On appeal, appellant argues that there was insufficient evidence to support his conviction for solicitation to commit murder because the State failed to establish that he tried to persuade Proctor to kill Kanu. Appellant states that "[c]ommon law solicitation requires proof beyond a reasonable doubt that the defendant acted to persuade another to commit a

crime." This argument, however, was not offered with particularity in either of appellant's motions for judgment of acquittal. In the first motion, after raising the issue of entrapment, appellant argued simply that there was not "enough evidence" to convict him of solicitation. In the second motion, counsel, again after raising the issue of entrapment, merely stated that the State had not satisfied its burden of proving him guilty beyond a reasonable doubt. Accordingly, appellant's argument that the State failed to establish that he tried to persuade Proctor to kill Kanu is not preserved for our review. *See Taylor v. State*, 175 Md.App. 153, 159, 926 A.2d 805 (2007), *cert. denied*, 401 Md. 174, 931 A.2d 1096 (2007); *State v. Lyles*, 308 Md. 129, 134–136, 517 A.2d 761 (1986); *Brooks v. State*, 68 Md.App. 604, 611, 515 A.2d 225 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987) ("a motion which merely asserts that the evidence is insufficient to support a conviction, without specifying the deficiency, does not comply with the Rule and thus does not preserve the issue of sufficiency for appellate review"); *Graves v. State*, 94 Md.App. 649, 684, 619 A.2d 123 (1993), *rev'd on other grounds*, 334 Md. 30, 637 A.2d 1197 (1994) (defendant could not appeal assault conviction on basis that identification evidence was insufficient where defense counsel did not mention identification evidence in moving for judgment of acquittal); *Graham v. State*, 325 Md. 398, 416–417, 601 A.2d 131 (1992) (defendant could not appeal on basis that stolen goods had a value of $300 or more because defense counsel did not mention value of goods as a ground in his motion). Therefore, what is preserved for our review is the defense of entrapment.[4]

## II.

The defense of entrapment is generally available "where there is an inducement on the part of the government

---

4. We note that appellant cannot simultaneously claim that he did not commit an act in which he was entrapped into committing. *See* Joseph F. Murphy, Jr., MARYLAND EVIDENCE HANDBOOK, § 403(A), at 118 (3rd. ed. 1993) ("The defendant charged with selling drugs does not get an entrapment instruction if he denies having committed the crime.").

officials for the accused to commit the offense and, if so, where the accused has not shown any predisposition to commit the offense." *Skrivanek v. State*, 356 Md. 270, 286, 739 A.2d 12 (1999); *see also Bowser v. State*, 50 Md.App. 363, 368, 439 A.2d 1 (1981).

### A. Entrapment as a Matter of Law

■ Appellant asserts that he "was entrapped as a matter of law." According to appellant, "no rational jury could have found beyond a reasonable doubt that [he] was not induced to solicit Proctor to murder [ ] Kanu[,]" and "no rational jury could have concluded beyond a reasonable doubt that [he] was predisposed to solicit Proctor to murder [ ] Kanu before he was induced to do so by Proctor's repeated and persistent police-directed solicitations, threats, and exploitations of [appellant's] friendship and trust."

In *Sparks v. State*, 91 Md.App. 35, 603 A.2d 1258 (1992), Judge Moylan laid out three procedural postures that entrapment may take on appeal. In arguing that entrapment was established as a matter of law:

> [T]he defendant will be claiming on appeal that the affirmative establishment of entrapment, as a matter of law, entitled him to an acquittal-not at the hands of the jury[,] but at the hands of the judge. If he was convicted in a court trial, the claim will be that the verdict of the judge was clearly erroneous. If he was convicted in a jury trial, the claim will be that the judge was legally in error in submitting the case to the jury.

*Id.* at 57–58, 603 A.2d 1258.

Appellant contends that the circuit court "erred by failing to grant [his] motions for judgment of acquittal [and for a new trial] . . . because [he] was entrapped as a matter of law." According to appellant, after he produced " 'some evidence that government agents induced the offense', [sic] the entire burden of persuasion with regard to the entrapment defense shifted to the State." He asserts that, "[a]s a matter of law and logic, if the evidence properly supported a finding by the

judge that inducement of [appellant] by Proctor did occur, than [sic] no rational jury could find beyond a reasonable doubt that inducement of [appellant] by Proctor did not occur." According to appellant, "no rational jury could have concluded beyond a reasonable doubt that [he] was not induced to solicit Proctor to murder [ ] Kanu[,]" or that he was "predisposed to solicit Proctor to murder [ ] Kanu before he was induced to do so[.]"

Clearly, the evidence did not establish entrapment as a matter of law. Proctor testified that, before he left L & W in November 2005, appellant had asked Proctor to "beat [Kanu] up," and later, appellant asked Proctor to kill Kanu, offering to pay Proctor $500 before leaving for a trip to Africa, and $1500 upon his return. These conversations took place before Proctor was arrested, and before the police became involved, in March 2006. The evidence, especially if Proctor was believed, was not "so clear and decisive that reasonable minds, applying the correct law, could not differ in finding that the defendant was induced by the police to commit the offense" or "that he was [not] predisposed to solicit Proctor to murder [ ] Kanu before he was induced to do so." The trial court did not err in denying appellant's motions for judgment of acquittal.

### B. Entrapment as a Matter of Fact for the Jury

Because the trial court submitted the case to the jury with an entrapment instruction, we will presume, without deciding, that appellant satisfied his burden of production of a prima facie case of entrapment. See Fisher, 28 Md.App. at 248–249, 345 A.2d 110. Accordingly, the issue of entrapment became an issue of fact for the jury to decide and the burden was on the State to prove, beyond a reasonable doubt, that appellant was predisposed to commit the offense and/or that appellant was not induced to commit the offense.

As Judge Moylan has explained:

It is in this posture as well that the adequacy of jury instructions defining the elements of entrapment may be involved. Also involved may be questions about the type of evidence the State may use to show a defendant's criminal

predisposition. In this procedural posture, on the other hand, no question will ever arise with respect to a burden of production. That is a non-issue here. The only questions will involve the burden or burdens of persuasion, the correctness and adequacy of jury instructions, and the admissibility of evidence. Issues in this procedural posture will, by their very nature, arise only in jury trials.

*Sparks,* 91 Md.App. at 58–59, 603 A.2d 1258. (Citations omitted.)

■■■ As it relates to the defense of entrapment:

An inducement by its very nature, contemplates more than a request and an affirmative response. It embraces, as well, the indispensable notion of an effective catalytic agent. It is more than a solicitation. It is more even than a successful solicitation. It also requires something by way of the unresisted bait or the effective precipitating agent that actually seduced an otherwise virtuous person from the paths of righteousness into the ways of the ungodly. It involves that sort of "grave threat," "fraud," or "extraordinary promise[.]" ... It requires, in a word, a catalyst.

*Sparks,* 91 Md.App. at 87, 603 A.2d 1258 (citations omitted; footnote omitted). Predisposition is the "willingness to commit a crime" and "may be shown by evidence, direct or circumstantial, that the defendant was ready and willing to commit the crime charged prior to the time that the law enforcement officers made initial contact." Maryland Criminal Pattern Jury Instruction ("MPJI–CR") 5:04 (2007 Suppl.).

Appellant argues that "[t]he record is replete with evidence that Proctor repeatedly and persistently pressured [him] to commit to Proctor's offer and kill [ ] Kanu in exchange for money[,]" and it "also plainly reveals Proctor's influence over [appellant] through exploitation of their friendship in addition to intimidation and open threats[.]" According to appellant, "[o]ne hallmark of inducement that has been consistently recognized is 'repeated, persistent solicitation of a previously law abiding citizen[,]' " and "[t]here is no dispute that [appellant] was 'a previously law abiding citizen' as he had no prior

convictions." He adds that "the judge implicitly found that [he] had met his burden of proving that he had been induced by the police by sending the issue of entrapment to the jury[, and] [t]his in itself should decide the issue of inducement as a matter of law because after the court found inducement by a preponderance of the evidence, no rational jury could have found non-inducement beyond a reasonable doubt."

This latter argument is premised on a misconception. Appellant had the burden of production of some competent evidence that, if believed, would establish a prima facie case of both inducement *and* lack of predisposition. In determining whether that burden has been met and the case goes to the jury, the trial judge does not weigh the evidence because "levels of persuasion are immaterial" to that determination. *Sparks*, 91 Md.App. at 79, 603 A.2d 1258. As we said in *Fisher*, 28 Md.App. at 251, 345 A.2d 110, "In this test of legal sufficiency, the court is not concerned with *any* burden of proof. A burden of proof is a yardstick used only by the trier of the facts in performing the function of assessing weight and credibility of evidence." (Emphasis added.)

As to predisposition, appellant asserts that he "was not predisposed, as a matter of law, because he exhibited none of the classic signs of predisposition, and because Proctor's testimony about [his] disposition prior to inducement by the State indicates only that [appellant] was venting emotional fantasies with no indication that he was 'ready and willing without persuasion' to act on those fantasies." "To prove predisposition," appellant contends, "the State relied on the testimony, inducements, and repeated solicitations of Proctor, a convicted liar, whose testimony in this case was fraught with contradictions and inconsistencies."

The State asserts that "[t]he notion that there was no evidence from which the jury could conclude beyond a reasonable doubt that there was no inducement or that [appellant] was predisposed to commit the crime is patently absurd." It explains:

First, ... the evidence showed that [appellant] offered Proctor $2,000 to kill Kanu at a time [when] Proctor had no connection to the police. In other words, [appellant] was not, as he laments, "the unwary innocent," who was lured into the criminal conduct by the police; rather, [he] was, as the jury properly concluded, "the unwary criminal," whose illegal actions merely were substantiated through expedient and appropriate police work.

\* \* \*

Furthermore, assuming arguendo that the jury found that [appellant] was induced by the police, the record supports the jury's conclusion that [appellant] was predisposed to killing Kanu.... When reviewed, as it must, in the light most favorable to the State ..., the evidence revealed both a plan and a request to kill Kanu that substantially predated any police involvement.... Even after [appellant] reconsidered the propriety of killing Kanu prior to his Africa trip, he made it clear to Proctor that he was not reconsidering his desire to have Kanu dead; rather, he simply asked Proctor to kill her at a later date so that he could decrease the chances of getting implicated in her murder. As the trial court properly determined, the jury could infer predisposition from this evidence[.]

■ "The credibility of the witnesses at trial is of course for the trier of fact[, and] the trier of fact is under no obligation to believe even uncontradicted explanations or denials of an accused." *Draco v. State*, 46 Md.App. 622, 628, 420 A.2d 1012 (1980). Here, the jury was entitled to believe Proctor and to disbelieve appellant. Viewing the evidence in the light most favorable to the State, the evidence, including Proctor's testimony, the recorded phone calls, the recorded and videotaped meetings, and the money that appellant paid to Proctor, was sufficient to convince a rational trier of fact beyond a reasonable doubt that appellant was not induced to commit the charged offense and/or that appellant was predisposed to commit the offense and then to reject the entrapment defense.

### III. Sentencing

■ Generally, a "sentencing court has 'virtually boundless discretion' in imposing a sentence." *Reiger v. State*, 170 Md.App. 693, 697, 908 A.2d 124 (2006), *cert. denied*, 397 Md. 397, 918 A.2d 469 (2007). In *Khalifa v. State*, 382 Md. 400, 416–417, 855 A.2d 1175 (2004), the Court of Appeals explained:

> A trial judge is vested with very broad discretion when sentencing a criminal defendant, so long as the sentence is based upon findings consistent with the jury's verdict. Ordinarily, we review the judge's sentencing judgment on three recognized grounds: "(1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) whether the sentencing judge was motivated by ill will, prejudice or other impermissible considerations; and (3) whether the sentence is within statutory limits."

(Citations omitted.)

■ Appellant argues that the sentencing court impermissibly considered the State's contentions at the sentencing hearing that appellant's "behavior constituted and fell within a 'pattern' of domestic violence against [ ] Kanu, when forming its decision about sentencing." The State contends that appellant's claim is not preserved because "no objection to the sentencing court's considerations was raised below." We agree.

In *Reiger*, the defendant claimed that the sentencing court impermissibly considered his parole eligibility and failed to object at sentencing. We stated:

> We hold that an objection is required to prevent waiver in these circumstances. [The defendant's] reliance on *Walczak [v. State*, 302 Md. 422, 427, 488 A.2d 949 (1985) ] is misplaced. The Court of Appeals has distinguished between errors by a sentencing court that result in an otherwise lawful sentence, and errors that inhere in the sentence itself. Only the latter type of error renders the sentence illegal. Thus, a claim that "a sentencing judge was motivated by impermissible considerations ... does not render the

sentence illegal within the meaning of Rule 4–345." For this reason, the *Walczak* holding that an objection is not necessary to preserve the right to appeal an illegal sentence does not apply to impermissible sentencing consideration claims. . . .

\* \* \*

When, as in this case, a judge's statement from the bench about the reasons for the sentence gives rise to the claim of impermissible sentencing considerations, defense counsel has good reason to speak up. A timely objection serves an important purpose in this context. Specifically, it gives the court opportunity to reconsider the sentence in light of the defendant's complaint that it is premised upon improper factors, or otherwise to clarify the reasons for the sentence in order to alleviate such concerns. As recognized in the rule, it is the availability of an opportunity to ask for and obtain immediate relief from the sentencing court that determines whether a contemporaneous objection is necessary. Simply stated, when there is time to object, there is opportunity to correct.

*Id.* at 700–701, 908 A.2d 124 (citations omitted; footnote omitted). As in *Reiger*, appellant did not object at the sentencing, or submit a motion for reconsideration.

Appellant suggests that an objection "would have run the risk of offending the court and adversely impacting the sentence that the court would impose" because it "would have been directed towards the court's lack of expertise to assess whether or not Kamara fell into a pattern of domestic violence." We see nothing in the record to support that statement. At counsel's request, the court exercised its discretion to permit appellant to rebut the State's position "[s]ince it is a serious case." In that rebuttal, appellant did not object to the State's characterization of his action as being "consistent with the cycle of violence that we see in domestic violence cases" or with the State presenting statements "purportedly obtained from the victim that were presented for the first time at the Sentencing Hearing without prior notice" to appellant. The

court expressly complimented counsel and "listen[ed] carefully" to him. The issue as to possible impermissible considerations at sentencing has been waived.

But, had the issue been preserved, it would fail on its merits. We are not persuaded that the court's recognition of a pattern of behavior that one might see in a domestic violence case is, in itself, an impermissible consideration or that it caused the court to "depart upward from the guideline range of 4–9 years." In this case, the State sought a 60–year sentence, suspended down to 30 years. Appellant's counsel, recognizing that the Pre–Sentence Report indicated a sentence "between four and nine years," asked the court "to consider something below the four years." When it sentenced appellant to 10 years, the court suspended all but 7 years. That sentence was squarely within the guidelines range because the guidelines refer to actual prison time. *See* Maryland Sentencing Guidelines Manual § 12.1 (2006) ("Suspended time *is not* considered in determining whether the sentence falls within the recommended guideline range. The guidelines range represents only non-suspended time.") (Emphasis in original).

In sum, the court "listened carefully to what [appellant's] lawyer said," rejected the State's sentencing request, but, refusing to treat the offense as a "minor offense," sentenced appellant within the guidelines range. The circuit court did not err or abuse its discretion.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**