984 A.2d 314

Thomas B. HARRIS

v.

STATE of Maryland.

No. 581 Sept.Term, 2008.

Court of Special Appeals of Maryland.

Nov. 30, 2009.

Brian T. Edmunds (Arnold & Porter, LLP, Washington, DC, Nancy S. Forster, Baltimore, MD, on the brief), for Appellant.

Ryan R. Dietrich (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, ZARNOCH and MATRICCIANI, JJ.

ZARNOCH, Judge.

On March 5, 2008, Thomas B. Harris, appellant, was convicted by a jury in the Circuit Court for Baltimore County of second-degree depraved heart murder of Karim Cross. On May 5, 2008, the court sentenced Harris to fifteen years' incarceration. On May 15, 2008, he timely appealed. For the reasons set forth in this opinion, we reverse and remand.

## FACTS AND LEGAL PROCEEDINGS

On the evening of August 12, 2006, Eric Sneed, Karim Cross, and some of their friends visited the Rush Hour Bar in Randallstown, Maryland. Before entering the bar, Sneed stayed outside to make a phone call. While standing in the parking lot "[r]ight outside the front door," Sneed observed an "upset" man leave the bar. Sneed saw the man pace back and forth, and then walk to a "champagne or gold"[1] vehicle, either

---

1. At trial, Sneed testified that the vehicle was "champagne or gold." In a handwritten statement to police, Sneed indicated that the vehicle was gray.

a "Trailblazer or a GMC Envoy," and open the door of the vehicle. The man then "walked over to another group of guys" who "came out of the bar," and then attempted to reenter the bar. When the upset man came to the bar's entrance, he had an "exchange ... [o]f words" with the bar's bouncer. Sneed also observed a "light purplish" Cadillac "with rims on it" pull into the parking lot, and caught a "glimpse" of the driver. Sneed walked into the bar. Later that night, he saw the driver of the Cadillac talking with the upset man inside the bar.

Sneed stayed at the bar for several hours and consumed three or four alcoholic drinks. He also consumed some beer earlier that afternoon. Sneed left the bar when it closed, at approximately 1:40 a.m. on August 13, 2006. While walking towards his truck, he "heard arguing and a commotion going on that's still at the front of the bar." In his vehicle, Sneed turned to look at the disturbance because it had grown "louder and louder," and saw Karim Cross "running to the middle of the parking lot like he was being chased" out of a "crowd of people." Two men separated themselves from the crowd along with Cross. Sneed identified one of the men as the "upset man" he had seen earlier pacing in the parking lot, and identified the other man as Bland Gatewood.

Sneed jumped out of his truck and "proceeded to go over there to see what was going on." Sneed testified that Bland Gatewood "swung a punch" at Cross, but was uncertain whether the punch connected. Sneed turned to look at the crowd, which included "people we [came] to the bar with," and the onlookers were "basically standing around watching." Sneed tried to "intervene in the middle," but everybody was "just looking at [Sneed], like, you know, leave it alone." Sneed saw Cross take two steps backward and fall, and saw that the victim had been stabbed in the stomach. Sneed saw the attacker "move something fast on [his] side." The object was "shiny," and Sneed believed it was a three-inch knife. Cross died from an approximately three-and-a-half inch deep stab wound to the abdomen. Sneed witnessed these events

from about twenty feet away, and admitted that there "wasn't much light" and the events happened "really fast."

Sneed testified that he was "100 percent" certain that the man wielding the knife was the same upset man he witnessed earlier pacing in the parking lot. The man was "dark-skinned," "about 5'5" with a "medium, stocky build," and had "no facial hair" and a "bald head." Sneed testified that Bland Gatewood swung the punch at Cross, and did not have a knife. He saw the man with the knife run to the same vehicle to which he had walked earlier that evening. Sneed described to the police a portion of the vehicle's tag number.

Detective Phillip Marll investigated the partial tag number provided by Sneed, and discovered that it was similar to the license plate of a "beige colored" Chevrolet Trailblazer rented by Harris's girlfriend and driven by him during the week of the murder. The vehicle was returned to the rental agency on August 14, 2006, the day after the murder. Detective Marll also discovered that Harris's cousin, Benjamin Scott, drove a blue Cadillac Concourse and met Harris at the bar that night. Sneed testified that photographs of those two vehicles produced by the State were "representative" of the cars he had observed in the parking lot.

Benjamin Scott testified that when he first arrived at the bar, he was not allowed in because he did not have any identification. Harris came out to "talk to the bouncer so [Scott] can get in." Scott had asked Harris to get him a bottle of liquor, and Scott observed Harris go to his car and come back with a bottle. Scott told police detectives that Harris was stopped by the bouncer when he tried to re-enter, and the bouncer told him to "take it back to the car." Scott testified that Harris put the bottle of liquor back in the car.

Detective Marll interviewed Reginald White, the Rush Hour Bar's bouncer, and asked him "whether [he] recalled an incident in which [he] told a customer that [the customer] couldn't come back in the bar unless he put whatever he got from his vehicle back." White indicated in a written statement to police that on the night of the murder he thought he saw an

upset man leave the bar and try to re-enter the bar with something in his pocket. White "didn't let him back in." During cross-examination, defense counsel asked White, "So under no circumstances did that person come back in the bar?" White answered, "I don't think so. Not to my knowledge."[2] White picked Harris's photo as the one that most closely resembled the man who left the bar and tried to re-enter. At trial, White said that he did not recall having any "problems, arguments, or anything" with Harris.

At the close of the State's case, Harris moved for a judgment of acquittal, arguing that the evidence was insufficient to convict him. The court denied the motion. The defense presented no evidence, and the court denied Harris's renewed motion for judgment of acquittal. The jury acquitted Harris of second-degree specific intent murder, but convicted him of second-degree depraved heart murder. Harris appeals that conviction.

## QUESTIONS PRESENTED

This appeal presents two questions:

1. Did the trial court abuse its discretion when it refused to declare a mistrial after it failed to promptly disclose to the defendant a communication between a juror and the trial judge's secretary?

2. Did the trial court err when it failed to enter a judgment of acquittal for appellant based on insufficiency of the evidence?[3]

---

**2.** Sneed's and Scott's testimony indicated that Harris was inside the bar later.

**3.** Appellant presented the following five questions verbatim:

1. Did the trial court err by sitting a juror whose grandmother was expected to die during trial, by failing to disclose to Mr. Harris a communication between the judge's secretary and the juror regarding the juror's continued ability to serve after his grandmother, in fact, died (at a time when alternate jurors were still available to replace him), and by refusing the bereaved juror's later request that he be

## DISCUSSION

### I. Communication With the Juror

At trial, after voir dire was completed and the jury was empaneled and sworn, a juror indicated to the court that he had a question. The following discussion took place:

THE COURT: Sir.

THE JUROR: Now can I ask my question? My grandmother went in the hospital. She's 89 years old and it was last Wednesday. They don't expect her to live. I think they don't expect—she fell and punctured her lung and then they're finding stomach fluids from where they were draining so they think she had a puncture in the stomach. She was going in today for an operation, and they don't expect her to live. I just don't know if there will be a funeral.

THE COURT: Okay.

THE JUROR: She's 89. That was the only thing. If there's no funeral, then I'm fine being her [sic].

excused or examined by the court regarding his continued ability to deliberate?

2. Did the trial court err by prohibiting Mr. Harris from eliciting, from the lead detective, exculpatory and impeachment evidence indicating that, despite the presence of a large crowd at the scene of the crime, and the fact that police interviewed at least 11 individuals who had witnessed the stabbing or otherwise had seen the suspect, the police obtained no eyewitness testimony that identified Mr. Harris as the person who committed the crime?

3. Did the trial court err by instructing the jury that "[y]ou have heard evidence regarding the identification of the defendant as the person who committed the crime," when no such evidence was introduced at trial?

4. Did the trial court err by permitting the State to introduce the inflammatory and prejudicial evidence concerning a knife found, four months after the crime, in Mr. Harris's *cousin's* car in the absence of any evidence connecting it to the crime?

5. Was the evidence sufficient to support Mr. Harris's conviction of second degree depraved heart murder given the circumstantial nature of the State's evidence?

We only address questions 1 and 5. We reverse on question 1 and address the sufficiency of evidence issue raised in question 5. Due to this disposition, we need not address questions 2, 3, and 4.

THE COURT: Right. Do you recall my asking you a question about your ability to serve?

THE JUROR: I thought it was something else to it, like, because then you continued that thought.

THE COURT: All right.

THE JUROR: Because I asked people around me should I go up there.

THE COURT: Okay. What hospital is she in?

THE JUROR: Anne Arundel County.

THE COURT: When was she admitted?

THE JUROR: Last Wednesday.

THE COURT: Thank you, sir. Any questions?

[PROSECUTOR]: No, sir.

[DEFENSE COUNSEL]: Just, sir, that being concerned about your grandmother, would you have to leave, or would your energies and focus be on what's going on with your grandmother or your family?

THE JUROR: When they took my cell phone today, I was concerned because I lost contact. You know, I was waiting to hear, and, like I said, if something happens, I would want to go to the funeral. If I had a chance that they said it looked like it was the end coming, I would be like to be able to go before that [sic].

THE COURT: We can certainly provide you with a contact number to give your family so even though you don't have a cell phone they could contact my chambers, and they'll get a message to you immediately.

THE JUROR: That works, if I can still go in the evening. If they call, they will come get me?

THE COURT: Yes.

THE JUROR: Okay.

THE COURT: Thank you so much.

THE JUROR: I didn't mean to—

THE COURT: That's okay. You can take a seat.

The evidentiary portion of the trial concluded two days later. At about 1:45 p.m. on March 5, 2008, shortly after the jury began deliberating, that juror sent a note to the court, at which time the following exchange occurred:

THE COURT: I have received another communication. This time from Juror No. 7 seated in Seat 6. It says, Judge, may I be excused from jury duty for family preparations? His grandmother passed away earlier today, but let me read to you what's his message.

Judge, may I be excused from jury duty for family preparations? If you can exchange me for an alternate jury member without disrupting anything, that will be great. If it is a big deal, please discuss with me. Thank you. He signs it.

One of my staff was contacted by one of his family members to tell him about the death of his grandmother, and we inquired whether he would be able to continue, and he said he would be able to continue. That discussion took place prior to my discharging the alternates.

Now, we have this letter.

[DEFENSE COUNSEL]: ... I wish I had known about the communication earlier because maybe we would have decided to go ahead and replace him anyway because, as you recall, when we were doing voir dire, he did seem to express some hesitation and concern that he could go and visit his grandmother at night, but he did have some concern that this could happen.

I would say that I'm a little distraught that we didn't know about it sooner so that I could—so we could have replaced him with an alternate, which would have been my suggestion.

THE COURT: Of course, at the time he said he was fine to continue.

[DEFENSE COUNSEL]: I know but we didn't know anything about the communication. That's what I'm trying to put on the record.

THE COURT: I didn't either, I believe, until more recently.

[DEFENSE COUNSEL]: My concern is that I don't want him rushing to make a decision because he wants to leave. I don't know if we can get any of the alternates so on behalf of Mr. Harris in light of this I think that it's unfair to ask this juror to continue, particularly when there's been a death in the family. I would ask for a mistrial.

THE COURT: All right.

The judge's secretary then stated on the record[4] what had taken place:

[SECRETARY]: I'm Jennifer Stalfort, Judge Finifter's secretary. [The juror]'s father called and informed me that his grandmother had just passed. I asked—I thought he would like to speak to his son so I had his son speak to him and then I asked—it was a short conversation.

He told his father that he would soon be finished he thought, and I asked him. When he was finished, I said, are you all right to continue? He said, yes, he was.

[DEFENSE COUNSEL]: When did that communication happen?

[SECRETARY]: Before lunch.

[DEFENSE COUNSEL]: After closing argument?

[SECRETARY]: [The juror], would probably know that. I'm trying to think. Yes. Because he was in the jury room. He was in the jury room, but they hadn't started to deliberate. They weren't all back.

[DEFENSE COUNSEL]: But it was after they were discharged?

THE COURT: No. Before they were discharged. Before he was discharged. The alternates.

[DEFENSE COUNSEL]: No. But the jury had been discharged at that point.

THE CLERK: To get lunch.

---

4. The secretary was not sworn in before speaking.

[DEFENSE COUNSEL]: They went to get lunch; in other words, we were finished with everything here in the courtroom as far as closing arguments and instructions, and the jury had been discharged. They were allowed to go get lunch and were directed to bring it back. Once all of them were back, then they would begin their deliberations so I think the point was that they had been discharged.

THE COURT: Discharged.

[PROSECUTOR]: Had they begun deliberating?

THE CLERK: No. They had not.

In opposition to the defense's request for a mistrial, the State argued that the juror had said that he could continue. Then, the following colloquy occurred:

[DEFENSE COUNSEL]: But their [sic] note now says he's not okay.

THE COURT: It doesn't say that.

[DEFENSE COUNSEL]: Well, it says that he wants to get out of jury service.

THE COURT: It says, if you can exchange me for an alternate jury member without disrupting anything, that will be great.

[DEFENSE COUNSEL]: So, he's asking to be relieved.

THE COURT: He's saying, if you can exchange me for an alternate jury member without disrupting anything that would be great. Implying he's fine otherwise. If it is a big deal, please discuss with me. I don't think he's saying he can't serve.

The court did not declare a mistrial and, in response to the defense's question whether the court would send anything back to the juror or respond to the juror's note, the judge said, "I guess I should say something to him. I'll just write, I cannot excuse you at this time. I cannot excuse you."

The jury continued deliberating. At 4:30 p.m., the court reconvened to read a note sent by the jury at 4:24 p.m., stating that it agreed about count one—second-degree specific

intent murder—but disagreed about count two—second-degree depraved heart murder. The prosecutor indicated that it had been "about four hours" since the jury began deliberating. Counsel agreed that the court should simply answer, "please continue to deliberate," which the court did. Later that day, the jury reached a verdict, acquitting appellant of second-degree specific intent murder, but convicting him of second-degree depraved heart murder. The transcript does not indicate the time that the verdict was rendered. Harris subsequently moved for a new trial, in part based on the juror-secretary communication. The court denied his motion. Appellant argues that the court abused its discretion when it refused to grant a mistrial after failing to promptly disclose the juror-secretary communication.[5]

Maryland Rule 4–326(d) provides:

The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action as promptly as practicable and in any event before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action. The clerk or the court shall note on a written communication the date and time it was received from the jury.

In *Stewart v. State*, 334 Md. 213, 222–23, 638 A.2d 754 (1994), the Court of Appeals discussed the rule[6]:

The court is obliged to notify the defendant and the State's Attorney of the receipt of such communication before responding to it. "All such communications between the court

---

**5.** Appellant also argues that the court erred when it allowed the juror to serve after he initially informed the court of his grandmother's predicament, and when it did not discharge the juror after he sent the note requesting to be excused. We do not address these issues because we reverse based on the court's failure to promptly disclose the juror-secretary communication.

**6.** The Court referred to former Rule 4–326(c), which has since been renumbered as Rule 4–326(d).

and jury *shall* be on the record in open court or *shall* be in writing and filed in the action" (emphasis added). These prescriptions are mandatory, not directory....

* * *

The Court of Special Appeals explored Rule [4–326(d)] in *Allen v. State*, 77 Md.App. 537, 551 A.2d 156, *cert. denied,* 315 Md. 692, 556 A.2d 674 (1989). The intermediate appellate court held that

> the Rule requires full communication of the contents of a jury communication so that both parties can have input into the response.

*Id.* at 545, 551 A.2d 156. The court quoted from its *Smith v. State,* 66 Md.App. 603, 505 A.2d 564, *cert. denied,* 306 Md. 371, 509 A.2d 134 (1986) that

> "while the rule expressly requires notice to the parties of any communication from the jury, its very spirit is to provide an opportunity for input in designing an appropriate response to each question in order to assure fairness and avoid error."

*Allen,* 77 Md.App. at 545, 551 A.2d 156. In *Graham v. State,* 325 Md. 398, 415, 601 A.2d 131 (1992), we agreed with *Allen* that

> the spirit of the Rule is to provide relevant information to those most vitally concerned with the trial....

 The defendant's right to be notified of a communication from the jury before the court responds to the communication is rooted in the defendant's constitutional right to be present at every stage of trial. *Taylor v. State,* 352 Md. 338, 346, 350, 722 A.2d 65 (1998) (citations omitted). A judge is required to notify the parties whether the judge "receives a communication from the jury or wishes to communicate with the jury." *Winder v. State,* 362 Md. 275, 322, 765 A.2d 97 (2001).

 Two important elements of Rule 4–326(d) are relevant in this case. First, the rule refers to the receipt of communication by "[t]he court" and "communications between the court

and the jury." Here, the communication was between the trial judge's secretary and the juror. In *Smith v. State*, 64 Md.App. 625, 633, 498 A.2d 284 (1985), this Court held that a judge's communication to a party through his law clerk violated the prohibition on *ex parte* communications with a party in the case. Other courts have also held that rules pertaining to *ex parte* communication apply whether the communication is to the judge or the judge's staff. *See Kamelgard v. Am. Coll. of Surgeons*, 385 Ill.App.3d 675, 324 Ill.Dec. 282, 895 N.E.2d 997, 1002 (2008) (noting that for the purpose of *ex parte* communication rules "the judge's law clerk is an extension of the judge"); *Martinez–Jones v. Dulce Indep. Sch.*, No. CIV07–0703 JB/WDS, 2008 WL 2229472, at *5, 2008 U.S. Dist. Lexis 42320, at *12 (D.N.M. Mar. 5, 2008) (stating that *ex parte* communication prohibitions apply to communications "with the judge or judge's staff"); *McQuay v. State*, 352 So.2d 1276 (Fla.Dist.Ct.App.1977) (holding it to be reversible error when a bailiff responded to a jury's question about the possible effect of the jury's failure to agree on a verdict and advised the jury of their duty to deliberate). We hold that for the purposes of Rule 4–326(d), the judge's secretary is included within the meaning of "court."

Second, the Rule relates to communications "pertaining to the action."[7] *Graham v. State*, 325 Md. 398, 415, 601 A.2d 131 (1992). When considering whether this juror's communication to the secretary pertained to the action, *Stewart* and several out of state cases are instructive.

In *Stewart*, the jury had begun deliberating in a criminal case when the judge was informed that "there was a problem" with one of the jurors. 334 Md. at 217, 638 A.2d 754. The

---

7. In *Graham*, the Court of Appeals considered whether a trial court abused its discretion when it refused to grant a mistrial after the trial judge read to counsel a note from the jury stating that the jury was split, but declined to disclose the numerical split that the jury indicated in its note. In passing, the Court said: "[W]e do not suggest that the failure to disclose the contents of a note from a juror requesting transmittal of a purely personal message to a member of the jurors' family or to a babysitter would constitute error." 325 Md. at 415, 601 A.2d 131.

judge went to the jury room and was handed a note signed by a juror stating that she needed to talk to the judge. *Id.* The female juror was "upset and tearful" and told the judge outside the jury room that "she was nervous and upset and afraid she was going to say something she shouldn't say to one of the other jurors." *Id.* Outside the presence of the defendant and counsel, the judge told the juror that he did not understand why she felt that she could not speak to another juror and that she should use her conscience in deciding how to handle disagreements. *Id.* "From her comments and from her attitude it seemed apparent [to the judge] there was a division of opinion among the jurors. So the judge asked her to go back and continue deliberating and exercise her best judgment as to how her duty should be discharged. She agreed to do that." *Id.* at 217–18, 638 A.2d 754. The Court of Appeals held that the judge's communication pertained to the action because "[a] juror's reluctance to continue to deliberate with the other jurors and separating from the other jurors by leaving the jury room cannot be divorced from the action." *Id.* at 223–24, 638 A.2d 754.

*People v. Beeler,* 9 Cal.4th 953, 39 Cal.Rptr.2d 607, 891 P.2d 153, 173–76 (1995), is somewhat similar to this case. In *Beeler,* during jury deliberations, a juror informed the court that his father had died, and the following was said on the record:

> THE COURT: Juror Coley called in this morning, indicated there was a death in his family. Other than that, no other formal message other than he expected to fly out of state at two o'clock in the afternoon today. I asked the clerk to get hold of him and find out the particulars of it. Court called both counsel. Neither have honored their 20–minute call. They've gone to Westminster Court. The court has been able to contact one of the parties, I believe, and they were beyond an hour limit. The court is going to cause the jury to begin deliberations again. I'm simply making a record of the information I've received from this juror, and that is that the family member that is

deceased is his father, they have a close relationship, he needs to be there, and he will be back—Monday?

JUROR COLEY: Monday.

THE COURT: The court's going to cause the jury to begin deliberations again and we'll recess early for the convenience of this juror, sometime before noon. And after I speak to the attorneys, the probability is that I will not excuse this juror and will not place an alternate in his seat and will expect that we will begin deliberations again on Monday. So even if the attorneys do not show, that is the information that Mr. Coley will have and he will be required to come back on Monday, unless there's some other severe family problem that you notify us of by phone. Okay?

JUROR COLEY: Okay.

*Id.* at 173.

Counsel arrived shortly thereafter and the court provided them with a transcript of the earlier conference between the court and the juror. *Id.* Defense counsel objected to the court's decision to not replace the juror, arguing that the jury would be pressured to reach a verdict that day, and objected to the judge's *ex parte* communication with the juror. *Id.* Later that morning, the jury reached a verdict. *Id.* at 174. Defense counsel reiterated his objection that the verdict had been coerced, but the court rejected the contention. *Id.* The court then queried the jury whether it was pressured to reach a verdict in order to allow the bereaved juror to leave, and the jury indicated it was not pressured. *Id.* The Supreme Court of California held that the trial court did not err when it instructed the juror to continue deliberating. *Id.* at 174–75. The court further held that the judge's communication with the juror did not violate the rules prohibiting *ex parte* communication, holding "[i]t is simply not error for a trial court to engage in a brief, administrative communication when informed of a death in a juror's family. Reality and common sense dictate that a court be allowed to learn what has happened." *Id.* at 175–76.

*State v. Phillips,* 508 S.W.2d 240 (Mo.Ct.App.1974), also appears similar to this case. In *Phillips,* the Court of Appeals of Missouri addressed the following scenario:

> Defendants also contend that a certain conversation between the judge and a juror was reversible error. This episode occurred on June 14, 1972, when the judge called both parties to his chambers. Mrs. Catanzaro, a member of the jury, was present. Both sides had rested their case by this time. The judge stated that he had informed Mrs. Catanzaro of the passing of an immediate member of the family and that he had permitted her to make a telephone call. She confirmed these facts. The court asked her at that time if she desired to remain on the jury, and she answered in the affirmative. The court asked her if she made this decision of her own free will. She stated that she had and that it was her decision alone to stay on the jury.

> In *State v. Jones,* 363 Mo. 998, 255 S.W.2d 801, 806[9] (1953), the court stated that private communications with a juror are forbidden and invalidate the verdict unless their harmlessness is made to appear. Certainly the facts indicate that the communication here was not the type that could be prejudicial in any way. This difficult situation seems to have been fairly handled without prejudice to the defendants.

*Id.* at 242.

█ In this case, the judge's secretary asked the juror if he was "okay to continue," and the juror responded, "yes." Appellant describes this short conversation as a "formal examination of the juror's state of mind." The State argues that it was "an innocuous, compassionate response to the affected juror's loss." However, we believe the inquiry clearly related to the juror's ability to deliberate. The trial judge described the conversation to counsel in these terms: "we inquired whether [the juror] would be able to continue, and he said he would be able to continue," and then again said, "[the juror] said he was fine to continue."

The State further argues that the exchange was "merely an administrative communication ... designed to confirm the status quo, i.e., that the affected juror would return to continue deliberations." At the beginning of the trial, the juror indicated that he wanted to be kept in touch with his family and that "if something happens, [he] would want to go to the funeral. If [he] had a chance that they said it looked like it was the end coming, [he] would be like to be able to go before that [sic]." The juror also said, "If there's no funeral, then I'm fine being her[e]." Thus, the State argues that the juror's affirmative response to the question whether he was "okay to continue" was merely a confirmation of the status quo—that the juror would continue deliberating as long as he would not miss his grandmother's funeral—that did not require informing the parties.

We recognize that the juror-court communication in this case does not reach the level of error present in *Stewart.* In *Stewart,* the visibly upset juror walked out of the jury room and told the judge that she was reluctant to continue deliberating with other jurors, and the judge failed to promptly disclose that to counsel and instructed the juror to continue deliberating. 334 Md. at 217–18, 638 A.2d 754. Here, in contrast, the juror indicated that he could continue deliberating. The record here contains no evidence that, outside the presence of defense counsel, the judge or his staff actively encouraged the juror to continue or acted with anything but the best of intentions. Rather, the record indicates that the court merely allowed him to continue deliberating. However, the purpose of Rule 4–326(d) is "to provide an opportunity for input in designing an appropriate response to each question in order to assure fairness and avoid error." *Allen,* 77 Md.App. at 545, 551 A.2d 156. Although the juror responded "yes" that he was "okay to continue," it was not merely a confirmation of the status quo. The circumstances had changed from the beginning of the trial. The juror's grandmother had died. Indeed, not long after answering that he could continue, the juror requested to be excused. Counsel should have been

provided the opportunity to help the court determine whether the juror's frame of mind had changed.

In *Beeler,* the Supreme Court of California rejected the argument that the trial judge erred when he spoke to the juror about his father's death outside the presence of counsel. 891 P.2d at 175. However, *Beeler* is inapposite to this case. The *Beeler* court promptly called counsel to inform them of the death in the juror's family and discussed the matter with counsel as soon as they arrived. In contrast, here the court failed to promptly notify counsel of the communication. Indeed, the court informed counsel only after the juror sent a note requesting to be excused. Moreover, whereas in *Beeler* "[n]othing in the record indicates there was any communication between the court and [the juror] that was not included in the record but which might have cast doubt on [the juror]'s ability to proceed," *id.* at 174, here the court communicated with the juror about his ability to deliberate after the juror had earlier indicated that he had hesitations about serving because of his grandmother's illness. In fact, even *Beeler* recognized that "[o]f course, a court at some point might err by going beyond what is administratively necessary." *Id.* at 176.

Two recent out of state cases advise that courts should err on the side of caution when dealing with jury communications. In *State v. Jojola,* 140 N.M. 660, 146 P.3d 305, 310 (2006), the Supreme Court of New Mexico discussed the New Mexico rule that "[a]ll communications between the court and the jury must be in open court in the presence of the defendant ... unless the communication involves only a ministerial matter." The court wrote: ·

> Whether a communication is relevant to the case or a ministerial matter is a factual determination for the trial court. Suffice it to say that issues relating to a juror's personal comfort or responding to a simple request for an extra copy of the written jury instructions already provided to the jury are ministerial.... In determining whether a communication is a ministerial matter, the best practice is for the trial court to confer with counsel for both sides and,

if there is any doubt, to err on the side of concluding that it is not.

*Id.* The court quoted the Supreme Court of Minnesota, which held that a jury communication outside the presence of the defendant relating solely to "housekeeping" matters does not violate the defendant's right to be present at all stages of a trial. *Id.* (*quoting Ford v. State,* 690 N.W.2d 706, 713 (Minn. 2005)). The Supreme Court of Minnesota then held that "any doubt regarding whether a communication relates to a housekeeping or substantive matter should be resolved in favor of defendant's presence." *Id.* (*quoting Ford,* 690 N.W.2d at 713.) Therefore, we conclude in this case that the court erred when it failed to promptly notify the defendant and counsel of the juror-secretary communication.

 In the context of impermissible *ex parte* communications with jurors, the Court of Appeals held that the State bears the burden of demonstrating beyond a reasonable doubt that the error was harmless. *Taylor,* 352 Md. at 354, 722 A.2d 65. *Taylor* and *Winder* demonstrate that when such a communication occurs, prejudice to the defendant is presumed.

In *Winder v. State,* 362 Md. at 323–24, 765 A.2d 97, the Court reversed Winder's convictions for other reasons, but discussed an *ex parte* jury communication that occurred during his sentencing proceedings. Following the conclusion of evidence presented at his sentencing for his murder convictions, the judge spoke with the jury presiding at the sentencing hearing outside the presence of counsel. The Court quoted from what the judge later described on the record:

Here are the total questions they asked. First of all, when are the alternates going to be released? I said, if the jury?as soon as the jury starts deliberating. The next question that they asked was about food and things and I told them that I can buy them dinner and sodas, things like that. Someone then asked me what we prefer? I said, well, if you are not too tired, I would like to see you deliberate a little tonight, but this is a decision that you can't make until 3:30 or 4 when we finish and you see how

you feel about it. Once I tell you to make the decision, you may talk about the facts of the case to determine whether you will make that decision.

The next question somebody asked is can the alternates stay in the courtroom afterwards? I said, yes. Somebody asked, can we talk to the attorneys? I said, yes, if you feel that you want to, you can. If you feel uncomfortable, then say no. Somebody said, well, what about if the press comes after us, wants us to talk? I said if you want to talk to them, fine. If you don't, it is whatever you feel.

And that is the long and the short of my conversation with the jury.

*Id.* at 303–04, 765 A.2d 97.

The Court of Appeals wrote, *id.* at 323–24, 765 A.2d 97:

The substance of the exchanges, as he related them, appear facially to be innocuous. Even if the communications were innocent or insignificant, however, they still potentially prejudiced Appellant. This lapse in discretion by the trial judge disturbed the integrity of the record and prevented us and Appellant from scrutinizing effectively the improper communications on appeal. . . .

 In our case, as well, the secretary's communication with the juror was not on the record, thus "disturb[ing] the integrity of the record and prevent[ing] us and [a]ppellant from scrutinizing effectively the improper communications on appeal."

In *Taylor*, 352 Md. at 340, 722 A.2d 65, the Court found that even when an *ex parte* communication with a jury was on the record and substantively accurate, prejudice to the defendant is presumed. During deliberations, the jury submitted to the court a two-page list of questions to which it sought answers. Outside the presence of counsel and the two defendants and without notifying them, the court answered the jury's questions and asked them to resume deliberations. *Id.* Neither of the defendants contended at trial or on appeal that the court's answers were substantively inaccurate. *Id.* Nevertheless, the Court wrote:

A reversal of the petitioner's conviction is required unless the record demonstrates that the trial court's error in communicating with the jury ex parte did not prejudice the petitioner. The State has failed to meet that burden, inasmuch as the record in this case does not demonstrate that the error was benign or, at least, its lack of prejudice.

\* \* \*

To be sure, when the supplemental jury instructions are substantively accurate, the petitioner may not be able, as in *Stewart*, to show prejudice affirmatively from the fact of the violation of the right to be present; however, neither does that fact mean that the record clearly shows a lack of prejudice resulting from that violation. On the contrary, at best, that circumstance renders the record silent on the issue so that prejudice will be presumed. Something more is required of the State than to establish the accuracy of the reinstructions the court gave. Indeed, to hold, as the State espouses, that a violation of the Rules giving effect to a defendant's right to be present at every stage of trial can be cured simply by giving a substantively accurate instruction, would render those Rules totally meaningless. Certainly the harmless error principle in the context of rules of practice was never intended to have that effect.

*Id.* at 354–55, 722 A.2d 65 (citations omitted).

In this case, the communication between the juror and the secretary occurred before the alternate jurors were discharged. By the time the judge disclosed the communication, the court had already discharged the alternates. After the juror sent the note to the court, the judge stated on the record that he did not learn of the communication, "[he] believe[d], until more recently." It is unclear whether the alternates had already been discharged when the trial judge learned about the communication. Defense counsel asserted that, had the communication been disclosed before the alternates were discharged, she would have requested that the juror be replaced with an alternate. Under these circumstances, we cannot conclude beyond a reasonable doubt that the court's error was harmless.

The Court of Appeals of Missouri in *Phillips* found that the judge's *ex parte* communication with a juror about her ability to deliberate after her family member died was harmless because she indicated both during that communication and later that she desired to remain on the jury. 508 S.W.2d at 242. Here, in contrast, the juror later requested to be excused.

The record indicates that the jury deliberated for at least four hours in total, including at least two hours and forty five minutes after the juror sent the note to the court requesting to be excused.[8] We do not know whether the juror whose grandmother died or other jurors failed to deliberate properly or rushed to reach a verdict. However, we cannot conclude beyond a reasonable doubt that appellant was not prejudiced by the court's failure to promptly disclose the *ex parte* communication. We therefore hold that the court abused its discretion when it refused to declare a mistrial, and we reverse. In order to determine whether we should remand to the circuit court, we next address whether there was sufficient evidence to convict.

## II. Sufficiency of the Evidence

Appellant argues that the court erred when it failed to direct a verdict based on insufficiency of the evidence. We have held:

> In reviewing a challenge to the sufficiency of the evidence, it is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case. Rather, we must decide whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reason-

---

**8.** Two hours and forty five minutes after the juror sent the note requesting to be excused, the jury sent a note that it agreed on one count and disagreed about the other. The jury reached a verdict later that day at an unknown time.

able doubt. This standard applies whether the verdict was based on direct or circumstantial evidence.

*Johnson v. State,* 156 Md.App. 694, 713, 848 A.2d 660 (2004) (citations and quotations omitted).

Appellant argues that his conviction was based solely on circumstantial evidence and "a conviction upon circumstantial evidence alone is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence." *Wilson v. State,* 319 Md. 530, 536–37, 573 A.2d 831 (1990) (citing *West v. State,* 312 Md. 197, 211–12, 539 A.2d 231 (1988)). He argues that the evidence presented did not "eliminate all 'reasonable hypothes[e]s of innocence.'"

Even if Harris is correct that his conviction was based solely on circumstantial evidence, the Court of Appeals has held:

[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand.... It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors. The rule does not require that the jury be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt. While it must afford the basis for an inference of guilt beyond a reasonable doubt, it is not necessary that each circumstance, standing alone, be sufficient to establish guilt, but the circumstances are to be considered collectively.

*Hebron v. State,* 331 Md. 219, 227, 627 A.2d 1029 (1993) (citations and quotations omitted).

The Court has also explained:

Circumstantial evidence may support a conviction if the circumstances, taken together, do not require the trier of fact to resort to speculation or conjecture, but circumstantial evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient. It must do more than raise the possibility or even the probability of guilt. It

must ... afford the basis for an inference of guilt beyond a reasonable doubt.

*Taylor,* 346 Md. at 458, 697 A.2d 462.

▮ The evidence in this case "afford[ed] the basis for an inference of guilt beyond a reasonable doubt" and did not "require the trier of fact to resort to speculation or conjecture." Prior to entering the bar, Sneed saw an upset individual pacing outside the bar and then walk to a distinctive vehicle. Sneed also saw the upset man have an exchange of words with the bouncer when he tried to re-enter the bar. Benjamin Scott testified that Harris went to his car to get a bottle of liquor and then was denied admittance when he tried to re-enter with the bottle. Reginald White, the bar's bouncer, identified Harris's photo as most closely resembling the man who tried to re-enter the bar. Later, Sneed saw that same individual fight with Cross and then move a shiny object on his side just after Cross was stabbed. Sneed then saw the man run to the same vehicle to which he had earlier walked. The police located a rental vehicle driven by Harris the week of the murder that resembled the distinctive vehicle and had a tag number similar to the partial number Sneed provided. Sneed also testified that Bland Gatewood swung a punch at Cross. Other evidence was presented that Gatewood was a friend of Harris. Taken together, the evidence provided the jury sufficient basis to conclude beyond a reasonable doubt that Harris murdered Karim Cross.

With respect to the argument that, in order to sustain a conviction, circumstantial evidence must be "inconsistent with any reasonable hypothesis of innocence," we reiterate what this Court has recently stated:

> Several cases have recited the litany that a conviction upon circumstantial evidence alone will not "be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence." *Hebron v. State,* 331 Md. 219, 224, 627 A.2d 1029 (1993) (quotation marks and citation omitted). *See also Wilson v. State,* 319 Md. 530, 536–37, 573 A.2d 831 (1990); *West v. State,* 312 Md. 197,

211–12, 539 A.2d 231 (1988). We have stated that these cases "have been understandably vague about what would constitute a case based solely on circumstantial evidence and what would amount to inconsistency with any reasonable hypothesis of innocence." *Hagez v. State,* 110 Md.App. 194, 204, 676 A.2d 992 (1996). *See State v. Smith,* 374 Md. 527, 560–61, 823 A.2d 664 (2003) (Harrell, J., concurring) (characterizing "reasonable hypothesis" language as "abstruse"). We stated that the better test is "whether the evidence, circumstantial or otherwise, and the inferences that can reasonably be drawn from the evidence, would be sufficient to convince a rational trier of fact beyond a reasonable doubt, of the guilt of the accused." *Hagez,* 110 Md.App. at 204, 676 A.2d 992 (citations omitted).

*Clark v. State,* 188 Md.App. 110, 116, 981 A.2d 666 (2009).

In sum, considered collectively, the evidence in this case afforded the jury a basis to conclude beyond a reasonable doubt that Harris was guilty. Because the evidence was sufficient to support a finding of guilt, we remand for a new trial.

## CONCLUSION

For the foregoing reasons, we hold that the court erred when it refused to grant a mistrial after it failed to promptly disclose the juror's communication with the judge's secretary; and the court did not err when it refused to enter a judgment of acquittal.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE DIVIDED EVENLY BETWEEN THE PARTIES.**